**UNITED STATES, Appellee,**

v.

**Claudia O'CAMPO, Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Julian REDEONDO, Defendant, Appellant.**

**Nos. 91–1089, 91–1278.**

United States Court of Appeals, First Circuit.

Heard Oct. 8, 1991.

Decided Sept. 3, 1992.

David N. Cicilline, Providence, R.I., for defendant, appellant O'Campo.

David A. Cooper with whom Alton W. Wiley, Jr. and Cooper & Sanchez, Providence, R.I., were on brief, for defendant, appellant Redeondo.

Margaret E. Curran, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., and Lawrence D. Gaynor, Asst. U.S. Atty.,

Providence, R.I., were on brief, for appellee.

Before BREYER, Chief Judge, TORRUELLA, Circuit Judge, and WOODLOCK,* District Judge.

WOODLOCK, District Judge.

These appeals require that we address issues of vicarious responsibility as they relate to both substantive criminal law and the law of criminal sentencing.

Appellant Julian Redeondo first appeared visible to investigators in this undercover drug prosecution after the exchange of drugs and money had been completed during the last of the three drug transactions involved. He had been in prison when the first two transactions were undertaken. There was no direct evidence of his involvement until 90 minutes after the exchange, when he made telephone contact with the paging device used by the undercover agent and the distributors in connection with their dealings. That contact quickly led to a return telephone call from the agent in which Redeondo inquired regarding the whereabouts of appellant Claudia O'Campo, who was the distributor's transferee for the drugs and the money in the transaction and whom—unbeknownst to Redeondo—Drug Enforcement Administration agents had already arrested. The telephone call with Redeondo was followed immediately by a person-to-person conversation the agent initiated during which, in response to a sardonic inquiry from the agent whether Redeondo thought O'Campo had been arrested, Redeondo laughed and said "next time we'll do it upstairs."

Redeondo claims on appeal that there is insufficient evidence to make him criminally responsible either for the conspiracy or the substantive distribution alleged in the two counts of his conviction. Redeondo also claims that the calculation of his relevant conduct for purposes of sentencing should not have included the amount of drugs involved in the two transactions completed while he was in jail.

Finally, as to sentencing, both Redeondo and O'Campo contend on appeal that they are entitled to treatment as minor participants in the scheme.

## I

The paging device used by DEA Special Agent Anthony Roberto acting in an undercover capacity as a cocaine purchaser is a common thread linking the appellants O'Campo and Redeondo to the three drug transactions and overarching conspiracy prosecuted in this case.

A. *The First Transaction (July 25, 1990)*—At some point before July 24, 1990, Roberto gave his paging device number to one Magdalena Tovar, now a fugitive, as a means to contact him when she had cocaine to sell. On July 24, 1990, Roberto's pager displayed the telephone number 725–7253. Roberto called that number, which was listed to the address of the defendant O'Campo, although not in her name. Roberto spoke to Tovar who arranged to meet with him the following day.

On July 25, 1990, Roberto met Tovar, who was accompanied by O'Campo and two small children, at a restaurant in Providence. Tovar agreed to sell Roberto ⅛ of a kilogram of cocaine for $4400. She directed Roberto to follow her to 102 Sabin Street in Pawtucket, O'Campo's address. Roberto accompanied the women to O'Campo's apartment. They confirmed the cocaine transaction and Roberto agreed to return later that afternoon to buy the drugs. When Roberto returned to O'Campo's apartment, he learned that O'Campo had to leave to get the cocaine. He left the apartment and within ten minutes his pager displayed the number for O'Campo's apartment. Roberto called the number and spoke with Tovar, who told him that she would be waiting outside the building. Roberto returned to 102 Sabin Street and met Tovar, who accompanied him to the basement. O'Campo was already there. O'Campo handed Roberto a package containing 123.4 grams of cocaine. Roberto handed $4400 to Tovar. Tovar then told Roberto that she and O'Campo were each

---

*  Of the District of Massachusetts, sitting by designation.

making $100 on this transaction. Redeondo was in jail in Florida when this transaction took place.[1]

B. *The Second Transaction (August 7, 1990)*—On August 1, 1990, Roberto called Tovar and they discussed the sale of two ⅛ kilograms of cocaine—one to be paid for up front and one to be taken on consignment. Roberto met Tovar and O'Campo that day at O'Campo's apartment at 102 Sabin Street. However, no transaction occurred because O'Campo expressed the fear that she was being followed by law enforcement personnel. After communicating with Tovar by phone later that day and the following morning, Roberto told her he wanted to postpone the deal until the following week.

On August 7, Roberto's pager displayed the number 725–7253. He called the number, spoke to O'Campo and agreed to meet her at a restaurant. Both O'Campo and Tovar met Roberto later that day and discussed the terms of the sale. Roberto drove Tovar back to O'Campo's Sabin Street apartment while O'Campo went to get additional cocaine. Rather than waiting, Roberto left the apartment for about an hour. When he returned he was met outside by Tovar. She directed him to the basement but stayed outside herself. O'Campo, who was waiting in the basement for Roberto, handed Roberto a package with 124.4 grams of cocaine in it. Roberto gave her $4400. O'Campo said that she would page him later when she had secured the second ⅛th kilogram quantity of cocaine. After receiving her page about an hour later, Roberto met O'Campo, who gave him another ⅛th kilogram package of cocaine on consignment. Redeondo was still in jail in Florida on August 7.

On August 8, Roberto's pager received the number 725–7253. He called that number and spoke to Tovar, who expressed concern about the outstanding debt for the cocaine taken on consignment. He told her he would pay within the next week or so. Between August 8 and August 16, Roberto's pager was activated on numerous occa-

sions displaying the 725–7253 number. Roberto did not return these calls until August 16, when he spoke with O'Campo. He told O'Campo that he had the money for the cocaine taken on consignment and wanted to purchase a full kilogram or ½ kilogram of cocaine. O'Campo told Roberto that she could sell him ½ kilogram for $15,000. When Roberto pressed for a full kilogram she said she would try to get another half. They agreed to meet at a restaurant later that day. When they later met at the restaurant, Roberto paid O'Campo the $4400 for the August 7 cocaine consignment.

C. *The Third Transaction (August 17, 1990)*—During the restaurant meeting on August 16, at which he paid O'Campo for the consignment sale, Roberto again expressed interest in purchasing a full kilogram of cocaine and showed O'Campo that he had some $30,000 to pay for it. O'Campo said she could put together a kilogram but did not call him back until 8 p.m. that evening. Roberto said he would get back to her the following day. On August 17 Roberto's pager displayed the number 725–7253. He returned the call and spoke with O'Campo, who said that she had ½ kilogram of cocaine and agreed to meet him in a restaurant in Providence. O'Campo arrived at the restaurant shortly after noon and said she only had ⅜ths of a kilogram of cocaine to sell. After she turned 370 grams of cocaine over to Roberto, he gave a pre-arranged signal and O'Campo was arrested by DEA agents at the scene.

About an hour and one-half later, Roberto's pager displayed telephone number 725–7253 again. Roberto called the number and spoke to an hispanic male whose voice he did not then recognize but whom he later identified as Redeondo. Redeondo asked Roberto, "Where is Claudia?", and stated, "Claudia did not return with the money." Roberto said that he had met with O'Campo and that everything had gone well. Roberto told Redeondo that he was nearby and would come to 102 Sabin

---

**1.** The evidence before the jury at trial was simply that Redeondo had been in Florida until some time after August 7, 1990. According to

the presentence report, which is not disputed, Redeondo was in jail in Florida until August 9.

Street shortly. When Roberto arrived at 102 Sabin Street, he saw Redeondo at the second-floor window of O'Campo's apartment. Redeondo told Roberto to come up to the apartment to speak to Tovar, who was on the phone. Roberto, however, declined and asked Redeondo to come down to the street. Redeondo came down and stood outside Roberto's car. He said that O'Campo had not returned with the money and asked Roberto when he had last seen O'Campo. Roberto told him that he had seen her at about 12:30. "Do you think she got arrested?" Roberto asked. Redeondo laughed and replied, "Next time we'll do it upstairs." Whereupon Redeondo was arrested.

## II

O'Campo pled guilty to conspiracy and substantive charges arising out of the transactions on July 25, August 7 and August 17. After rejecting her argument that she should be treated as a minor participant in the venture, the district judge sentenced her to 51 months imprisonment, followed by five years supervised release.

Redeondo went to trial on the two counts brought against him. Count One alleged a conspiracy among Redeondo, O'Campo and Tovar to distribute and possess with intent to distribute cocaine. Count Two charged Redeondo as an aider and abetter in the distribution of cocaine on August 17, 1990. He was convicted on both counts. After adding the drug quantities involved in the July 25 and August 7 transactions to the amount involved in the August 17 transaction for purposes of the base offense calculation and rejecting Redeondo's argument that he be treated at most as a minor participant in the venture, the district judge sentenced him to 85 months imprisonment followed by five years supervised release.

## III

To provide a framework for resolution of Redeondo's claims, some discussion of theories of criminal responsibility which the government contends are applicable is necessary.

A. *Conspiracy*—The conspiracy charged under 21 U.S.C. § 846 in Count One required the government to prove that Redeondo became a member of a conspiracy with Tovar and O'Campo to distribute cocaine. The relevant considerations were set forth concisely in *United States v. Drougas*, 748 F.2d 8 (1st Cir.1984):

> The gist of conspiracy is an agreement to disobey or to disregard the law. Two types of intent must be proven: intent to agree and intent to commit the substantive offense. A conspiratorial agreement may be proven by circumstantial as well as direct evidence. "A common purpose and plan may be inferred from a development and a collocation of circumstances." The government need not exclude every reasonable hypothesis inconsistent with guilt with respect to each piece of circumstantial evidence. Rather, "the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant the jury to conclude that defendant is guilty beyond a reasonable doubt."

*Id.* at 15 (citations omitted). "Stated another way, 'conspiratorial agreement need not be express so long as its existence can plausibly be inferred from the defendants' words and actions and the interdependence of activities and persons involved.'" *United States v. Concemi*, 957 F.2d 942, 950 (1st Cir.1992) (quoting *United States v. Boylan*, 898 F.2d 230, 241–42 (1st Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 139, 112 L.Ed.2d 106 (1991)). However, "[t]he government need not establish that the defendants knew or agreed upon every detail of the conspiracy. 'All that is required is to show "the essential nature of the plan and their connections with it."'" *United States v. Sanchez*, 917 F.2d 607, 610 (1st Cir.1990) (citations omitted), *cert. denied*, —— U.S. ——, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991).

Apparently concluding that a conspiracy to distribute a controlled substance like cocaine is "so serious that the agreements themselves demonstrate both genuine societal danger and clear intent," P. Marcus, *Prosecution and Defense of Criminal*

*Conspiracy Cases,* Section 2.08[1] at 259 (1991), the Congress has imposed no requirement that an overt act be proved in order to establish a violation of 21 U.S.C. § 846. *See, e.g., United States v. Paiva,* 892 F.2d 148, 155 (1st Cir.1989); *United States v. Williams,* 809 F.2d 75, 80 (1st Cir.1986), *cert. denied,* 481 U.S. 1030, 1072 & 482 U.S. 906, 107 S.Ct. 1959, 2469, 2484, 95 L.Ed.2d 531, 877 & 96 L.Ed.2d 377 (1987); *United States v. DeJesus,* 520 F.2d 298, 301 (1st Cir.), *cert. denied,* 423 U.S. 865, 96 S.Ct. 126, 46 L.Ed.2d 94 (1975).

■ However, we have emphasized that "[t]here must be an agreement by the parties, not merely a getting together to consummate the transaction" before a drug conspiracy can be found. *United States v. Izzi,* 613 F.2d 1205, 1210 (1st Cir.), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980). Thus, we have found the simple purchase of a controlled substance insufficient to establish a conspiracy. *Id.* And similarly, we have cautioned that the fact that a "defendant knew what was going on, .. is not enough to establish intent to conspire." *United States v. Ocampo,* 964 F.2d 80, 82 (1st Cir.1992).

■ In short, to be held responsible for participation in a criminal conspiracy a party must be shown to have entered knowingly, willfully and intentionally into an agreement to further the conspiracy's purposes.

B. *Aiding and Abetting*—With respect to the substantive violation of 21 U.S.C. § 841 arising out of the August 17 transaction charged in Count Two, the government proceeded against Redeondo on an aiding and abetting theory under 18 U.S.C. § 2.[2] This theory required the government to show that Redeondo had associated himself with the unlawful cocaine distribution enterprise in some way and that he affirmatively participated in the venture in some fashion so as to make it succeed. *See, e.g., Nye & Nissen, v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949); *United States v. Lema,* 909 F.2d

561, 569 (1st Cir.1990); *United States v. Campa,* 679 F.2d 1006, 1010 (1st Cir.1982).

■ We have recently examined in some detail what is necessary to establish affirmative involvement as an aider and abetter and observed that "the line that separates mere presence [at the site of a drug crime] from culpable presence is a thin one, difficult to plot." *United States v. Ortiz,* 966 F.2d 707, 712 (1st Cir.1992). Following an extensive review of the case law, we concluded in *Ortiz* that when the evidence shows a defendant arriving at the locus of a prearranged drug deal with the contrivance of a principal, a jury may be justified in concluding that the defendant's involvement is something more than innocent association with the criminal activity of the principal. *Id.* at 712. Although addressing the situation of simultaneous presence of the defendant and the principal at a site of criminal activity, the *Ortiz* analysis is useful in evaluating the situation in which a defendant appears on the scene after the exchange of drugs and money. Among the factors to be considered in determining if such a defendant is an aider and abetter are: whether his appearance at the locus of the criminal transaction results from an association with the principal familiar enough to give rise to knowledge of the purpose of the principal's presence at that scene; whether the defendant's presence entails expression of concern for the principal's return with the proceeds of the transaction; and whether that presence results from the use of a paging device—a well-recognized tool of the drug trade, *cf. id.* at 713–14 and cases cited. In order for aiding and abetting liability to be applicable, however, the evidence must establish that the defendant knowingly, willfully and intentionally sought by his action or presence to make the principal's criminal transaction succeed.

C. *Pinkerton Responsibility*—Although the government's case against Redeondo was not presented to the jury under

---

**2.** The evidence supported conviction only on an aiding and abetting theory. *Cf. United States v. Sanchez,* 917 F.2d 607, 611–12 & n. 1 (1st Cir. 1990). That was the only theory of substantive responsibility the government fully developed in its closing argument and it was the theory upon which the district judge's charge to the jury was based.

the *Pinkerton* theory of responsibility,[3] we discuss that theory because of its bearing on the claim of error Redeondo makes concerning the calculation of his relevant conduct for sentencing purposes.

Under the doctrine of *Pinkerton v. United States*, 328 U.S. 640, 645–46, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946), a defendant co-conspirator may be held responsible for a substantive crime committed by another conspirator in furtherance of the conspiracy if that crime is committed while the defendant co-conspirator is a member of the conspiracy.

Although our shorthand descriptions of the *Pinkerton* requirements have sometimes not included reference to the need to prove that the defendant co-conspirator was a member of the conspiracy contemporaneously with the commission of the substantive offense for which he is vicariously charged, *see, e.g., Sanchez*, 917 F.2d at 612; *United States v. Glenn*, 828 F.2d 855, 860 (1st Cir.1987), in more extensive descriptions of the *Pinkerton* requirements we have acknowledged the need to prove "that appellant was a member of the conspiracy at the time [the substantive offense was committed]." *United States v. Alvarez*, 626 F.2d 208, 210 (1st Cir.1980).[4] The need to prove as an element of *Pinkerton* liability that the co-conspirator under consideration was a member of the conspiracy at the time another conspirator committed a substantive crime is recognized in the standard jury instructions. *See generally* E. Devitt, C. Blackmar & K. O'Malley, Federal Jury Practice and Instructions § 28.10 (4th ed. 1990); L. Sand, J. Siffert, W. Loughlin & S. Reiss, Modern Jury Instructions ¶ 19.03 (Instruction 19–13) (1991). And, the

importance of this element was emphasized by the Solicitor General's confession of error after specific questions were raised by the Supreme Court in *Levine v. United States*, 383 U.S. 265, 86 S.Ct. 925, 15 L.Ed.2d 737 (1966). There the government conceded "that an individual cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy," *id.* at 266, 86 S.Ct. at 926, and the Court reversed the conviction.

The requirement of contemporaneous participation in the underlying conspiracy in order to establish substantive criminal liability for acts committed by other conspirators in furtherance of the conspiracy flows from the rationale of *Pinkerton* itself, which distinguished cases where the substantive offense "was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." 328 U.S. at 648, 66 S.Ct. at 1184. An individual cannot in any sensible use of the words be held reasonably to have "foreseen" actions which occurred prior to his entrance in the conspiracy and thus are historical in nature.

## IV

After careful consideration of the evidence, we are satisfied that the circumstances of Redeondo's contact with Roberto are sufficient to permit a rational factfinder to conclude Redeondo was criminally responsible for the August 17 transaction and thus to justify his conviction under

---

3. The government did not argue and the district judge did not charge on a *Pinkerton* theory of liability. In its brief on appeal, the government alludes to *Pinkerton* principles of responsibility as a basis for Redeondo's conviction on the substantive offense. Because this basis was not presented to the jury we decline to consider it on the question of substantive liability. As more fully developed in Part V of this opinion, however, *Pinkerton* principles are pertinent to calculation of the sentence.

4. Other circuits have similarly acknowledged the essential nature of this requirement. *United*

*States v. Blackmon*, 839 F.2d 900, 909 (2d Cir. 1988) ("defendant cannot be retroactively liable for offenses committed prior to his joining the conspiracy"); *see also United States v. Harrell*, 737 F.2d 971, 981 (11th Cir.1984) ("latecomer cannot be convicted as a principal for substantive offenses which were committed in furtherance of the conspiracy before he joined it ..."), *cert. denied*, 469 U.S. 1164 & 470 U.S. 1027, 105 S.Ct. 923, 1392, 83 L.Ed.2d 935 & 84 L.Ed.2d 781 (1985); *United States v. Knippenberg*, 502 F.2d 1056, 1059 (7th Cir.1974).

One as a conspirator and under Count Two as an aider and abetter.

First, Redeondo's conversation indicated that he was aware that O'Campo, in whose apartment he was living, was engaged in a venture involving a dangerous transfer from which she was expected to return with money.

Second, by contacting Roberto through the paging device and using the number for O'Campo's apartment, Redeondo employed a modus operandi used only by the distributors for their criminal activities.

Third, although Redeondo had moved in with O'Campo only a few days earlier, his August 17 conversation with Roberto and particularly his response when the issue of arrest was raised ("Next time *we'll* do it upstairs") evidenced a shared involvement in the instant transaction, a forward looking perspective anticipating not a one-shot deal but an ongoing understanding to continue distributing drugs and a professional awareness of the need to conduct such transactions in a place concealed from law enforcement or other dangers to those transferring drugs for money.

In short, this is a case in which the jury was justified in concluding that "individual pieces of evidence insufficient in themselves to prove a point . . . in accumulation prove it. The sum of the evidentiary presentation may well be [treated as] greater than its constituent parts." *Ortiz,* 966 F.2d at 711, (quoting *Bourjaily v. United States,* 483 U.S. 171, 179–80, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987)).

In evaluating a claim of evidentiary insufficiency, "we examine the evidence in the light most flattering to the prosecution (in the process drawing all reasonable inferences in its favor) so that we may ascertain whether the proof would have allowed a rational jury to determine beyond a reasonable doubt that the defendant was guilty of the crime charged." *Ortiz,* 966 F.2d at 711 (citations omitted). The jury could properly conclude that Redeondo's role was to monitor the safe return of O'Campo in order to insure that the distributive transaction of cocaine for money was fully consummated. This was a role neces-

sary to the successful completion of the goals of a cocaine conspiracy, and the evidence reflected agreement with those goals as charged in Count One. It was also a role that affirmatively aided and abetted the transaction as charged in Count Two. The jury was warranted in finding that this was a role Redeondo assumed knowingly, willfully and intentionally. We will not disturb the jury's guilty verdicts on those counts.

## V

■ Although we affirm Redeondo's criminal liability, we find the calibration of the proper punishment for that liability at the sentencing phase of this case to have been in error. When calculating the amount of drugs upon which to base the offense level, the district court included the amounts sold on July 24 and August 7 together with the amount sold in the August 17 transaction. Redeondo, as we have noted, *see* note 1 *supra,* was in jail in Florida when the July 24 and August 7 transactions took place.

In rejecting Redeondo's argument at sentencing that the July 24 and August 7 drug amounts should not be included in the calculation of relevant conduct, the sentencing judge made reference to "a very-well established legal doctrine, that is, one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of the co-conspirators made after the formation and in furtherance of the conspiracy. That answers the question, and he's charged with that responsibility." Mar. 21, 1991, Tr. at 16. In addition, the sentencing judge made reference to certain of the language contained in § 1B1.3 of the United States Sentencing Guidelines, which defines relevant conduct as including "all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* (quoting U.S.S.G. § 1B1.3(a)(2)).

■ While we recognize that a party may be chargeable with having adopted the acts of his co-conspirators before he joined the conspiracy for purposes of criminal *lia-*

*bility as a conspirator* [5], this responsibility does not extend to criminal *liability for prior substantive offenses* committed in furtherance of the conspiracy. *See generally United States v. Blackmon,* 839 F.2d 900, 908–09 (2d Cir.1988). And we do not believe that the prior drug transactions may be included in this case as relevant conduct of the defendant Redeondo for which he can be held accountable at sentencing.

The Sentencing Guidelines have emphasized that principles of criminal liability—like those of conspiracy law which the sentencing judge here found dispositive—do not dictate all the answers to questions of sentencing accountability for joint criminal activity. The current and applicable Application Note cautions that "the scope of the jointly-undertaken criminal activity, and hence relevant activity [for sentencing purposes], is not necessarily the same for every participant." U.S.S.G., § 1B1.3, comment. (n. 1) (1991). Proposed clarifying amendments to this guideline are even more explicit in their admonition that substantive criminal liability and sentencing accountability are not always coincident.[6] We have held that for sentencing "[i]n the context of a conspiracy, the proper inquiry

in determining whether such additional acts should be included as relevant conduct is whether those acts were reasonably foreseeable by the defendant and committed in furtherance of the conspiracy." *United States v. Garcia,* 954 F.2d 12, 15 (1st Cir. 1992). The central concept then is foreseeability. The foreseeability concept is embedded in the language of the Sentencing Guidelines.

The route to this central concept begins—but does not end—with subsection 1B1.3(a)(2), the only provision of the Guidelines to which the district judge made express reference. That subsection, in turn, requires cross reference to subsection 1B1.3(a)(1), which defines relevant conduct as "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction ... or that otherwise were in furtherance of that offense." It is not disputed that Redeondo was incarcerated when the July 25 and August 7 transactions took place and thus did not directly commit or aid and abet those offenses. The remaining question is whether he "would be otherwise accounta-

---

**5.** The language of conspiracy liability is sometimes broadly stated and carries with it the potential that it will spill over into applications distinct from conspiracy liability analysis. Thus, for example, we have vividly described "a conspiracy [as] like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight—or conduct—regardless of whether he is aware of just what it is composed." *United States v. Baines,* 812 F.2d 41, 42 (1st Cir.1987) (citation omitted). A less metaphorical description holds that "one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of co-conspirators, made after the formation and in furtherance of the conspiracy." *United States v. Cintolo,* 818 F.2d 980, 997 (1st Cir.) (citation omitted), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987). This presumptive adoption of prior acts and declarations, however, is relevant principally to issues of co-conspirator hearsay, Fed.R.Evid. 801(d)(2)(E), *see generally Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); proof of the scope of the conspiracy; and proof of an overt act in cases, unlike this drug conspiracy, where proof of such an act is necessary. The presumptive adoption of the acts of co-

conspirators does not automatically extend to substantive responsibility for those prior acts, as *Pinkerton* and its progeny make clear. A similar limit on the reach of the presumptive adoption of earlier co-conspirator acts is appropriate in the sentencing context. To return to the rich metaphorical language of *Baines* and apply it to the sentencing context, one who joins the crew of a conspiratorial train should presumptively be paid only in accordance with the work of the crew while he is on board.

**6.** A new Application Note 1 is contained in proposed 1992 amendments to § 1B1.3, *Amendments To The Sentencing Guidelines For United States Courts,* 57 Fed.Reg. 20148 (1992), which will go into effect November 1, 1992 unless Congress directs otherwise. The new Application Note observes that "the principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability ... the focus [at sentencing] is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator." *Id.*

ble." On this question Application Note 1 to U.S.S.G. § 1B1.3 provides the relevant language:

> In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was *reasonably foreseeable* by the defendant.

(emphasis supplied).[7]

Recognizing the centrality of the concept, the government attempts to bring the facts of this case into the rubric of "reasonable foreseeability" by arguing oxymoronically that the *"prior* conduct [of his co-conspirators] was reasonably *fore*seeable" to Redeondo. Government's Brief at 20 (emphasis supplied).

The Seventh Circuit has observed that such an argument means that "the concept of foreseeability (a forward-looking concept) must be turned around 180 degrees [to] be applied to the conduct of co-conspirators occurring before the entry of a particular defendant into the conspiracy." *United States v. Edwards*, 945 F.2d 1387, 1393 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). We decline to engage in a construction of the language of foreseeability that requires such a forced linguistic *volte-face.*

To be sure, opinions from other circuits have suggested that foreseeability is not the only touchstone for determining the sentencing liability of those who join an ongoing conspiracy after certain substantive crimes have been committed in furtherance of its objectives by other conspirators. The Second Circuit, for example, has held that a "late-entering co-conspirator should be sentenced on the basis of the full quantity of narcotics distributed by other members of the conspiracy only if, when he joined the conspiracy, he could reasonably foresee the distributions of future amounts, or *knew or reasonably should have known what the past quantities were." United States v. Miranda–Ortiz,* 926 F.2d 172, 178 (2d Cir.) (emphasis supplied), *cert. denied,* —— U.S. ——, 112 S.Ct. 347, 116 L.Ed.2d 287 (1991). This formulation echoes language in a prior version of Application Notes for the Sentencing Guidelines applicable to the drug calculation in that case.[8] But the earlier Application Note language has been modified,[9] *in-*

---

**7.** The use of "reasonable foreseeability" language in the Application Note to U.S.S.G. § 1B1.3 is an apparent allusion to *Pinkerton,* where the Supreme Court suggested that a co-conspirator would not otherwise be accountable for a substantive offense "which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." 328 U.S. at 648, 66 S.Ct. at 1184.

**8.** Prior to the November 1, 1989 Amendments to the Sentencing Guidelines, Application Note 1 to § 2D1.4 provided that

> [i]f the defendant is convicted of conspiracy, the sentence should be imposed only on the basis of the defendant's conduct or the *conduct of co-conspirators* in furtherance of the conspiracy *that was known to the defendant* or was reasonably foreseeable.

(emphasis supplied).

The pre–1989 Amendment provisions of Application Note 1 to § 1B1.3 similarly recognized co-conspirator sentencing responsibility for *"conduct* in furtherance of the conspiracy *that was known to* or was reasonably foreseeable by defendant." (emphasis supplied).

**9.** As part of an effort "to clarify the definition for which the defendant is 'otherwise accounta-

ble'," U.S.S.G. Amend. 137 & 78, 1989 Amendments consolidated discussion of the relevant conduct of a co-conspirator in a revised Application Note 1 to § 1B1.3. These amendments deleted reference to conduct "that was known to the defendant." As revised, the Application Note 1 to § 1B1.3 now speaks simply of "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." The revised Application Note goes on to explain that

> Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly-undertaken criminal activity, and hence relevant conduct, is not necessarily the same for every participant. Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.

There remains the potential for misinterpretation of § 1B1.3 created by Illustration e to Application Note 1. That illustration states:

> Defendants H and I engaged in an ongoing marihuana importation conspiracy in which

*ter alia,* by striking the "known to the defendant" reference and thereby eliminating the correlative potential for imposing sentencing accountability on newcomers to the conspiracy for prior substantive offenses simply on the basis of a newcomer's awareness of the prior offenses. The recent proposed amendments to § 1B1.3 promulgated by the Sentencing Commission to "clarif[y] and more fully illustrate[ ] the operation of the guidelines," *Amendments To The Sentencing Guidelines for United States Courts,* 57 Fed.Reg. 20148, 20150 (1992), continue to avoid reference to the mere knowledge of the defendant while sharpening the focus on "reasonable foreseeability" as the basic touchstone in this area.[10]

We have emphasized that proving a "defendant knew what was going on" is not sufficient to establish co-conspirator criminal liability. *Ocampo,* 964 F.2d at 82. We similarly believe that the base offense level at sentencing cannot be based on mere knowledge of historic facts. Section 2D1.4, dealing with drug conspiracies, directs that the "offense level shall be the same as if the object of the conspiracy ... had been completed." This formulation suggests that sentencing concern with conspiracies and conspirators is prospective and the relevant inquiry is to determine the foreseeable object to which the individual conspirator agreed.[11] The past performance of the conspiracy, known to the late-

---

Defendant J was hired only to help off-load a single shipment. Defendants H, I, and J are included in a single count charging conspiracy to import marihuana. For the purposes of determining the offense level under this guideline, Defendant J is accountable for the entire single shipment of marihuana he conspired to help import and any acts or omissions in furtherance of the importation that were reasonably foreseeable. He is not accountable for prior or subsequent shipments of marihuana imported by Defendants H or I if those acts were beyond the scope of, and not reasonably foreseeable in connection with, the criminal activity he agreed to jointly undertake with Defendants H and I (*i.e.,* the importation of the single shipment of marihuana).

To the degree Illustration e may be read to suggest by negative implication that prior shipments can in some circumstances be reasonably foreseeable, the illustration seems to perpetuate the conceptual difficulties presented by the pre–1989 Application Notes. We read the illustration, however, to suggest that known prior shipments are relevant to determining the *scope* of the future activity of the conspiracy the new co-conspirator has agreed to join. We note, moreover, that the illustration has been modified in proposed amendments designed to emphasize further the forward looking character of the reasonable foreseeability concept. *See* note 10 *infra.*

10. The proposed 1992 amendments follow the 1989 amendments in declining to make mere knowledge of past activity a material consideration in assessing accountability at sentencing. The proposed amendments also delete the potentially ambiguous reference in the current guideline to acts and omissions for which "the defendant would be otherwise accountable." The clarifications proposed in the amendments are structured to define sentencing accountability directly in terms of "reasonable foreseeabil-

ity." In the words of revised Application Note 2: "The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision." *Id.* at 20148–49. With specific reference to controlled substances, the proposed Application Note provides that "the defendant is accountable for all quantities of contraband for which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." *Id.* at 20149.

Two new illustrations, c. 5. and c. 7. appear particularly designed to emphasize that mere knowledge of the broader distribution activity of a co-conspirator is insufficient to hold a defendant accountable for that broader activity when the defendant's own agreement and conduct are, despite that knowledge, limited to a narrower transaction. *Id.* at 20150. Moreover, illustration e in the current version of the guidelines, *see* note 7 *supra,* has been modified to appear as illustration c. 3. and provides that a defendant who joins "an ongoing marijuana importation conspiracy ... only to help offload a single shipment ... is not accountable for *prior* or subsequent shipments...." *Id.* at 20149 (emphasis supplied).

11. In focusing at sentencing on the precise scope and objects of the conspiracy as the particular defendant understood them, we do not suggest that a single conspiracy will be fractionated into a multiplicity of independent agreements. For purposes of criminal responsibility as a conspirator, it has long been settled that conspirators may be convicted simply "upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Blumenthal*

joining co-conspirator, may be relevant to a careful analysis directed to the understanding such a co-conspirator has of the anticipated quantity of the drug distributions the conspiracy intends to undertake after he joins. But historic activity should not simply be aggregated wholesale in the largely "mechanical operation," *United States v. Blanco,* 888 F.2d 907, 909 (1st Cir.1989), involved in calculation of the drug quantity which will establish the base offense level for the late-joining conspirator.

The Seventh Circuit's decision in *Edwards* is instructive on this point because it seeks to relate knowledge of past conduct to the scope of the late-arriving co-conspirator's agreement. *Edwards* holds that "[c]onduct of co-conspirators—even past conduct—can be considered 'reasonably foreseeable' to a particular defendant who has demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct." 945 F.2d at 1393–94. But we are reluctant to adopt the *Edwards* approach entirely. *Edwards* still contains unacceptable vestiges of reliance on the oxymoronic characterization of "prior conduct" as being "reasonably foreseeable," for example in its holding that:

> In order to sentence a defendant based on the entire quantity of drugs distributed in a conspiracy, when the defendant has joined the conspiracy in its late stages, it must be shown that those earlier transactions were reasonably foreseeable to him.

*Id.* at 1396.

■ We are of the view that the base offense level of a co-conspirator at sentencing should reflect only the quantity of drugs he reasonably foresees it is the object of the conspiracy to distribute after he joins the conspiracy. In making the judgment what a co-conspirator can "reasonably foresee," the earlier transactions of the conspiracy before he joins but of which he is aware will be useful evidence. However, a new entrant cannot have his base offense level enhanced at sentencing for drug distributions made prior to his entrance merely because he knew they took place. Thus, for example, if a defendant joins a conspiracy he knew previously engaged in distribution of extraordinary amounts of drugs, his knowledge of those prior acts will inform the judgment about what he reasonably could have foreseen the conspiracy would entail in the future. He might, for example, then be found reasonably to have foreseen future distributions of similarly large quantities. Nonetheless, he cannot be held liable as a substantive matter for, nor can his sentence on a conspiracy charge be calculated by aggregating, those earlier distributions, because he was not a member of the conspiracy when they took place.

■ Here Redeondo can plainly not be held responsible under any theory of sentencing accountability for the quantity of drugs involved in the July 25 and August 7 transactions. He is not responsible for those transactions as substantive offenses under classic *Pinkerton* principles, because the transactions took place before he joined the conspiracy. Nor can the transactions be treated as relevant to the question of what was "reasonably foreseeable" in terms of drug quantities as a future object of that conspiracy, because there is no competent evidence that he even knew about them. Consequently, we will vacate the sentence imposed and remand for resentencing without aggregation of the drug quantities involved in the July 25 and August 7 transactions in the calculation of base offense level.

## VI

Both defendants sought to obtain a downward adjustment in their base offense level pursuant to U.S.S.G. § 3B1.2 on grounds that they were minor participants in the transaction. In the absence of a

---

*v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947). At sentencing, however, the task is the more individualized inquiry into the details of the conspiracy known by the specific late-joining defendant and the implications of those details for that defendant's understanding of the foreseeable scope and objects of the joint enterprise he has joined.

mistake of law, we review a district court's role in the offense determination only for clear error. *Garcia,* 954 F.2d at 16. *See also United States v. Dietz,* 950 F.2d 50, 53 (1st Cir.1991); *United States v. Akitoye,* 923 F.2d 221, 227 (1st Cir.1991). We find no such mistake of law or clear error here. It is apparent that each defendant played a critical role in the transaction. For O'Campo it was as the telephone point of contact and the actual transfer agent for the drugs and money. For Redeondo, it was in his attentive follow up for a significant transaction the conspirators had undertaken. The trial court was fully justified in declining to treat either as a minor participant.

## VII

Accordingly,

The judgment in its entirety as to appellant O'Campo in No. 91–1089 is

*Affirmed.*

The judgment of conviction as to appellant Redeondo in No. 91–1278 is

*Affirmed. The sentence is vacated and the case is remanded for resentencing.*