UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1279

UNITED STATES,

Appellee,

v.

EFRAIN DE LA CRUZ,

Defendant, Appellant.

No. 92-1347

UNITED STATES,

Appellee,

v.

LUIS TORRES,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Breyer, Chief Judge,

Cyr and Boudin, Circuit Judges.

James E. Carroll with whom Peabody & Arnold was on brief for

appellant Efrain De La Cruz.
William H. Kettlewell with whom Dwyer, Collora & Gertner was on

brief for appellant Luis Torres.
Geoffrey E. Hobart, Assistant United States Attorney, with whom

A. John Pappalardo, United States Attorney, and Jeffrey A. Locke,

Assistant United States Attorney, were on brief for appellee.

June 24, 1993

BOUDIN, Circuit Judge. Efrain De La Cruz, Luis Torres

and others were charged in a one-count indictment with

conspiracy to possess cocaine with intent to distribute. 18

U.S.C. 841, 846. Torres pleaded guilty; De La Cruz was

convicted following a jury trial. In this appeal, De La Cruz

challenges his conviction on a number of grounds, and both he

and Torres contest the district court's calculation of their

sentences. We affirm.

The events in this case are part of a larger story

revolving around a so-called sting operation conducted by the

FBI and other law enforcement agencies. In the course of

this operation, Colombian drug dealers delivered 615

kilograms of cocaine to a man named Pedro Alvarez who was

secretly cooperating with the authorities. The cocaine was

transported into the United States and the FBI lodged it in

Massachusetts while awaiting directions from the Colombian

drug dealers. In describing the ensuing events, we confine

the story to facts pertinent to this case.

The cocaine arrived in the United States on or about

June 4, 1991, and on June 5, the Colombian suppliers directed

that a portion--240 kilograms--be turned over to the "Lucho"

group. Alvarez made contact with a man purporting to be

Lucho and it was agreed that Lucho's associates would take

delivery at 5 p.m. on June 12, in the parking lot of a

Holiday Inn in Taunton, Massachusetts. Two undercover

-3-

officers--FBI Agent Dillon and Providence Police Officer

Colon--appeared at the arranged time and place and saw a gold

Cadillac with three occupants driving slowly through the

parking lot. De La Cruz was the driver of the Cadillac and

Torres was a passenger; the other passenger was Jose LaPaix.

The agents flashed their lights and Torres left the car,

approached the agents, and discussed the mechanics of the

drug transfer. Torres said that he had brought three vans

with him from New York equipped with hidden compartments

but had left them in Newton, Massachusetts. It was agreed

that Torres would drive to Newton with his companions to

collect the vans and would contact Dillon and Colon when he

returned to the Holiday Inn. Torres, De La Cruz and LaPaix

departed in the Cadillac.

Several hours later, around 9 p.m., Agent Dillon

received a telephone message that Torres was waiting at the

Holiday Inn. The agents returned to the parking lot. Torres

approached their car and told them that he had the vans; but

he said that having seen a police car driving through the

lot, he had directed his "rollos"--a term used in the drug

trade to refer to an underling such as a bodyguard or driver-

-to move the vans out of the lot. Torres and the agents then

agreed to meet at the rear of the lot.

A few minutes later, Torres arrived there driving a blue

van bearing New York plates with one Ruben Rodriguez seated

-4-

next to him. A minute later De La Cruz pulled alongside the

agents' car driving a red van with New York plates. The red

van was followed by the gold Cadillac, now driven by LaPaix,

with one Sarah Tavares as a passenger. The third van did not

appear and a few minutes later Torres signaled the agents to

lead the way to where the cocaine was stored.

The FBI had located the shipment in a warehouse in

Middleboro, Massachusetts, equipping the facility with video

and audio recording equipment. Within half an hour, the

caravan of vehicles arrived at the warehouse and parked in

front. Agent Dillon, seeking to prevent too many of the

suspected gang members from concentrating in one place, asked

Torres to move one of his vehicles away to avoid attracting

attention. Torres and LaPaix conferred; they then spoke with

De La Cruz, who left the red van and drove the Cadillac

across the street into a parking lot shared by a gas station

and an ice cream parlor.

De La Cruz drove slowly through this lot, which was

partly lit and in view of a number of people. He then drove

back across the street to an unlit vacant lot where he

parked. This new lot was adjacent to the warehouse. De La

Cruz left the Cadillac and started back toward the warehouse.

He was then arrested by FBI agents. When arrested, he was

carrying both a beeper and a portable telephone.

-5-

Meanwhile, after De La Cruz left the warehouse parking

lot in the Cadillac, Torres backed the blue van into the bay

area of the warehouse, where he was joined by Rodriguez and

LaPaix. The three men removed the rear seats and floor panel

of the van, uncovering a hidden compartment. They then began

loading the cocaine into the van. After about 70 kilograms

were loaded into the compartment, the three men were

arrested. Torres, when arrested, had in his pocket a

business card with the telephone number used to reach De La

Cruz's beeper.

Subsequently, all five of those present at the

warehouse--Torres, De La Cruz, Rodriguez, LaPaix and Tavares-

-were indicted for conspiring to possess cocaine with intent

to distribute. In early November 1991, some weeks before

trial, LaPaix entered into plea negotiations and, on November

7, he made a limited proffer to the government for purposes

of persuading it to treat him at sentencing as a minor

participant. He made clear that he would refuse to testify

for the government at trial and that he wanted his meeting

with the government to remain confidential.

During the proffer, LaPaix was asked how De La Cruz

became involved. He responded that they were long-time

friends and that prior to June 12 neither of them knew about

the cocaine pick-up nor was De La Cruz promised payment for

his help. Shortly after November 7, LaPaix' counsel told the

-6-

other defense counsel--in what detail is not clear--about the

meeting with the government and its subject matter. Prior to

trial De La Cruz advised LaPaix' counsel that he intended to

call LaPaix as a witness.

Trial began on November 18, 1991. Immediately before

the jury was impaneled, Torres and LaPaix pled guilty. The

government dismissed the indictment as to Tavares. De La

Cruz and Rodriguez then went to trial. On November 22, a

Friday, the government rested and Rodriguez began to testify

in his own defense. Rodriguez did not return to court the

following Monday. The court refused De La Cruz's request to

sever or for a mistrial and the case proceeded against De La

Cruz and the now absent Rodriguez.

On November 25, the sixth day of trial, De La Cruz moved

for production of any exculpatory material created by LaPaix'

proffer. In an ex parte submission, the government provided

to the court a summary of LaPaix' proffer. Over the

government's objection, the court found the material to be

subject to production under Brady v. Maryland, 373 U.S. 83

(1963). The government then disclosed to De La Cruz the

contents of LaPaix' proffer, so far as it concerned De La

Cruz, as follows:

[During the drive from New York to Boston] LaPaix
contacted Efrain De La Cruz. And De La Cruz drove
LaPaix and Torres to the Holiday Inn in Taunton for
the meeting with Special Agent Dillon . . . . As
to why there were so many telephone calls between
De La Cruz and LaPaix prior to the pickup of the

-7-

cocaine or prior to the drive to Taunton, he
indicated that they were long-time friends from the
Dominican Republic . . . . The import of the
statement was that De La Cruz did not know prior to
June 12 about the cocaine pickup in the same way
that LaPaix did not know prior to June 12th.

De La Cruz then called LaPaix as a witness, advising the

court that the proffer bore out De La Cruz' defense that he

was unaware of the drugs and was merely helping out a

childhood friend (LaPaix) find his way around Massachusetts.

LaPaix was summoned but, in a voir dire examination, LaPaix

invoked the Fifth Amendment and refused to answer all

questions other than his name and address. De La Cruz

objected to the claim of privilege in light of LaPaix' prior

guilty plea. The district court nevertheless sustained the

claim of privilege, observing that government cross-

examination could produce testimony that would inculpate

LaPaix not merely in the instant transaction but in other

transactions.

On November 26, the jury found De La Cruz and Rodriguez

guilty. De La Cruz was sentenced to 188 months imprisonment

and Torres to 235 months. These appeals followed. In this

court, De La Cruz attacks his conviction by challenging the

sufficiency of the evidence, the denial of his motion to

sever or for a mistrial after Rodriguez disappeared, and the

treatment of the proffer and LaPaix' claim of privilege. We

address these issues first and then consider the claims of

both De La Cruz and Torres concerning their sentences.

-8-

We start with De La Cruz' attack on the adequacy of the

evidence and find that the evidence as to his knowledge of

the conspiracy was circumstantial, arguably thin, but clearly

sufficient. The evidence, considered in the light most

favorable to the government, see United States v. Ortiz, 966

F.2d 707, 711 (1st Cir. 1992), cert. denied, 113 S. Ct. 1005

(1993), shows that De La Cruz appeared at both meetings

accompanying three other men involved in the drug deal

(Torres, LaPaix and Rodriguez); that De La Cruz drove to

Taunton one of the vans intended to carry the drugs; that he

took instructions from Torres, the leader of the group; that

he cruised slowly through the lot opposite the warehouse and

then moved the Cadillac from a well-lit location to another

location where it would be less likely to be noticed; that he

carried a cellular telephone and a beeper--both well known

tools of the drug trade; that the contact number for the

beeper was in Torres' possession; and that De La Cruz and

LaPaix had exchanged various telephone calls in the days

prior to June 12.

These facts, in our view, permitted a rational jury to

conclude beyond a reasonable doubt that De La Cruz was a

knowing participant in the conspiracy to transport drugs.

Any one fact alone may be explained away; but the

combination--presence at the scene, suspicious conduct,

subordination to the gang leader on the scene, and possession

-9-

of communication tools widely used in drug dealing--add up to

more than the sum of the parts. It was left largely to his

counsel to suggest, based on fragments of evidence, that De

La Cruz was essentially a bystander, innocently doing a favor

for his old friend LaPaix. It is not surprising that the

jury rejected this tale.

De La Cruz argues that his name never appeared in the

hundreds of tape recordings made by the FBI as Alvarez

promoted the sting with the Colombians, but there is no

reason why a low level "rollo" should be mentioned in such

conversations. True, De La Cruz never saw or touched the

cocaine, nor is there direct evidence that he knew of its

existence. But knowledge may be based on circumstantial

evidence, Ortiz, 966 F.2d at 711, and it is the jury's job to

draw the proper inference. Here the materials for drawing

the inference were supplied to the jury, and the inference

was rational.

De La Cruz' next claim is that the government wrongly

withheld information about LaPaix' proffer that it was

obligated to disclose under the Brady doctrine. The

government has properly abandoned any claim that the proffer

was not exculpatory at all. It now argues that the promise

of confidentiality to LaPaix excused the government from

disclosing the material, cf. United States v. Hicks, 848 F.2d

1 (1st Cir. 1988), and that in any case LaPaix' lawyer

-10-

disclosed the substance of the proffer to De La Cruz well

before trial. We need not resolve the legal dispute on the

first point or the factual dispute on the second, for the

simple reason that the government did disclose the proffer,

under compulsion, during trial.1

In cases of belated disclosure, "the critical inquiry is

. . . whether the tardiness prevented defense counsel from

employing the material to good effect." United States v.

Devin, 918 F.2d 280, 290 (1st Cir. 1990). Here LaPaix'

proffer, assuming its contents were previously unknown to

counsel for De La Cruz, did not reveal any new line of

defense; rather, the proffer was consistent with the defense

that De La Cruz had pursued from the outset. No evidence was

lost by the delay: LaPaix was produced immediately. That he

then claimed privilege is a problem De La Cruz would have

faced whenever the proffer was disclosed. In short, we find

no prejudice from the delay.

We turn now to De La Cruz' claim that the district court

erred in sustaining LaPaix' invocation of the Fifth

Amendment. This claim is probably the most troublesome

aspect of De La Cruz' appeal because it sets in tension two

1We do not formally resolve the government's claim that
it can avoid Brady by promising confidential treatment to

someone it interviews; but we are skeptical of any such
blanket claim and would expect the government affirmatively
to present the issue to the district court if otherwise
exculpatory material were withheld on this ground.

-11-

cardinal precepts: that a criminal defendant should have full

opportunity to secure evidence in his own defense, and that a

witness should be protected against being compelled to

provide testimony that may incriminate him. The core of De

La Cruz' argument is that LaPaix had already pled guilty to

the conspiracy at issue and could not incriminate himself

further if asked, as De La Cruz proposed to do, whether De La

Cruz was aware that drugs were to be transported.

It is uncertain what LaPaix would have said had he

testified (the proffer was that De La Cruz knew nothing prior

to June 12) but the proffer was suggestive and it is surely

possible that LaPaix would have exculpated his friend

entirely. The jury in turn might have disbelieved any such

exculpation in light of the friendship between the men and

the other evidence against De La Cruz. But the hoped-for

testimony was relevant and credibility is for the jury to

decide. Since the government's evidence of De La Cruz'

knowledge was circumstantial, the direct testimony of LaPaix

to the contrary might have been important, even decisive.

Yet whatever the cost to De La Cruz, under the

Constitution LaPaix was entitled to invoke his Fifth

Amendment privilege if testifying might incriminate him. The

trial court's on-the-spot judgment as to the risk of self-

incrimination is entitled to deference and "should not be

overruled unless it is 'perfectly clear` . . . that the

-12-

answers [sought from the witness] 'cannot possibly`

incriminate." United States v. Johnson, 488 F.2d 1206, 1209

(1st Cir. 1973) (quoting Hoffman v. United States, 341 U.S.

479, 487-88 (1951)). In this case, we think the district

judge was not only reasonable but plainly correct in holding

that compelling LaPaix to testify could threaten to

incriminate him.

LaPaix had not been sentenced at the time of De La Cruz'

trial, and "the convicted but unsentenced defendant retains a

legitimate protectable Fifth Amendment interest" as to

matters that could affect his sentence. United States v.

Lugg, 892 F.2d 101, 102-03 (D.C. Cir. 1989); accord, United

States v. Lema, 987 F.2d 48, 54 n.6 (1st Cir. 1993). Here,

if LaPaix testified that he had recruited De La Cruz and

involved him in the plot without telling him of the drugs,

this testimony could have hurt LaPaix' chances at sentencing

of being treated as a minor or minimal participant, U.S.S.G.

3B1.2, and could even have led the court to classify him as

a "supervisor," and enhance his sentence. U.S.S.G. 3B1.1 &

comment note 1 (listing "the recruitment of accomplices" as

relevant to evaluating a defendant's role in the offense).

As the district court suggested, testifying would also

have put LaPaix at risk of disclosing his involvement in

other drug transactions. The government, in order to

challenge LaPaix' testimony exculpating De La Cruz, would

-13-

almost certainly have sought to question LaPaix vigorously

about other possible transactions in which LaPaix and De La

Cruz were involved. The aim would be to undercut LaPaix'

claim of an innocent friendship that led by accident to De La

Cruz' presence at the scene. See Fed. R. Evid. 404(b) (other

wrongs may be proved to refute claim of mistake or accident).

And LaPaix' refusals on voir dire to provide anything except

his name and address indicate that the privilege would have

been promptly invoked in response to such questions.

Some courts have said that the trial judge may or even

must limit the government's cross-examination on collateral

matters if this can be done without unduly limiting the

government and if doing so will preserve the defendant's

ability to call a material witness who would otherwise claim

the privilege.2 In this case, however, effective government

cross-examination would have been seriously impaired if the

prosecutor were denied latitude to explore the joint criminal

history of De La Cruz and LaPaix. Faced with a simple denial

by LaPaix that he had told De La Cruz of the cocaine--the

testimony that De La Cruz' counsel said he hoped to elicit--

2See United States v. Esparsen, 930 F.2d 1461, 1469-70

(10th Cir.), cert. denied, 112 S. Ct. 882 (1991) (collecting

cases). United States v. Pardo, 636 F.2d 535 (D.C. Cir.

1980), is the classic example. In United States v. Zirpolo,

704 F.2d 23, 26 (1st Cir.), cert. denied, 464 U.S. 822

(1983), this court declined to decide whether it would follow
Pardo.

-14-

inquiry into the past activities of the two would have been

the most obvious resort for cross-examination.

We have "recognized the need to prevent coconspirators

from `whitewashing' each other through use of testimony

unchallengeable for one reason or another." Zirpolo, 704

F.2d at 26 (quoting United States v. Lowell, 649 F.2d 950,

962 (3d Cir. 1981)). There is nothing that prevents a

defendant from offering such testimony if the alleged co-

conspirator is willing to testify, but the safeguard of

cross-examination is more important than usual in such a

case. Cf. Fed. R. Evid. 804(b)(3) (excluding hearsay

evidence of this kind, unless corroborated, from declaration-

against-interest exception to the hearsay rule). In short,

we do not think that in this case the privilege could

properly be preserved by cabining the government's cross-

examination.

Of course, the prosecutor could resolve the dilemma by

seeking formal immunity for the witness under 18 U.S.C.

6003, but most courts have held that judges are powerless to

compel such a grant by the U.S. Attorney. See United States

v. Angiulo, 897 F.2d 1169, 1191 (1st Cir.) (collecting

cases), cert. denied, 498 U.S. 845 (1990). Indeed, the

privilege has been routinely invoked by alleged co-

conspirators called by the defendant to exculpate him. E.g.,

Zirpolo, 704 F.2d at 25; Johnson, 448 F.2d at 109. A trial

-15-

court might still refuse to entertain the prosecution if it

found that defense testimony had been thwarted by the

misconduct of the prosecutor (e.g., by gratuitously

threatening to prosecute the witness if he testifies). No

basis has been suggested for a misconduct claim in this case.

It must be remembered that the defendant could also

testify to the very same exculpatory facts, for "[a]

defendant is available to himself as a witness." Gacy v.

Welborn, Nos. 92-3448 and 92-3965, slip op. at 22 (7th Cir.

April 12, 1993). A defendant who declines to testify,

protecting himself against self-incrimination on cross-

examination, is well within his rights; but so is the witness

who invokes his own Fifth Amendment rights to avoid

testifying and so is the prosecutor who declines to grant

immunity to the witness. There may be rare cases where the

denial of immunity would comprise a miscarriage of justice.

This is not such a case.

De La Cruz' final argument, apart from sentencing

issues, is that the court erred in denying his motion for a

mistrial or a severance when Rodriguez failed to appear for

the sixth day of trial. While the jury might have inferred

Rodriguez' guilt from his flight, the jury was shown a

videotape of Rodriguez loading cocaine into the van so the

inference added little. De La Cruz had no direct link with

Rodriguez and there is no reason why he should have been

-16-

affected by the inference. Finally, the court offered to

negate the inference with an appropriate instruction, but De

La Cruz' counsel objected to such an instruction, preferring

to argue to the jury about the import of Rodriguez' absence.

Nor can any prejudice be traced to Rodriguez' own

testimony, completed but not fully cross-examined, when he

left the trial. We have reviewed Rodriguez' testimony and

conclude that it did not incriminate De La Cruz or seriously

conflict with his own theory of defense. Indeed, Rodriguez

never once referred to De La Cruz. In any case, the court

offered to strike the testimony and so instruct the jury but

again, for tactical reasons, De La Cruz rejected this offer,

so we do not see how he can now complain that the testimony

remained on the record.

We come, finally, to the objections of De La Cruz and

Torres to the sentences imposed upon them. A narcotics

conspirator is responsible not only for drugs he actually

handled or saw but also for the full quantity of drugs that

he reasonably could have foreseen to be embraced by the

conspiracy he joined. See U.S.S.G. 2D1.4, 2D1.1, 1B1.3 &

comment n.1; United States v. O'Campo, 973 F.2d 1015, 1023

(1st Cir. 1992). The district court's finding as to the

quantity embraced by the conspiracy and reasonably foreseen

by the defendant is a factual one and will not be disturbed

unless clearly erroneous. United States v. Tracy, 989 F.2d

-17-

1279, 1287 (1st Cir.), cert. denied, 61 U.S.L.W. 3773 (1993).

The same standard of review applies to other factual issues

pertinent to sentencing, including the role played by the

defendant in the conspiracy. United States v. Tabares, 951

F.2d 405, 410 (1st Cir. 1991).

Here, the district court held De La Cruz responsible for

the entire 240 kilograms of cocaine that the Lucho group

sought to collect from the warehouse. De La Cruz argues in

this court that there is no evidence that he knew the precise

amount of cocaine that was inside the warehouse. Strictly

speaking, that is so. What he must have known, however, was

that a very large quantity was involved: as the district

court noted, De La Cruz was part of a four vehicle caravan

that included two vans destined to carry away the cocaine

stored at the warehouse.

A defendant who conspires to transport for distribution

a large quantity of drugs, but happens not to know the

precise amount, pretty much takes his chances that the amount

actually involved will be quite large. On De La Cruz'

theory, no amount at all could properly be assigned to him

if, as may well be the case, he never had a specific quantity

in mind. The danger actually posed by the conspiracy was the

distribution of 240 kilograms, De La Cruz knew that a large

quantity was involved, and--absent special circumstances--we

think that is enough.

-18-

De La Cruz also takes issue with the district court's

decision to treat him as a "minor participant" in the

conspiracy, resulting in a two-level downward adjustment.

U.S.S.G. 3B1.2(b). Instead, De La Cruz argues, he should

have been classed as a "minimal participant" and given a

four-level reduction under section 3B1.2(a). The guidelines

and commentary do not define "minimal" but they do say that

the adjustment will be used "infrequently"; and they also

furnish a pair of examples of a minimal participant: "someone

who played no other role in a very large smuggling operation

than to offload part of a single marihuana shipment, or . . .

an individual [who] was recruited as a courier for a single

smuggling transaction involving a small amount of drugs."

U.S.S.G. 3B1.2 comment note 2. Here, De La Cruz was one of

the drivers in a caravan seeking to carry away a very large

cache of narcotics. He fits neither the letter nor the

spirit of the examples.

Torres, by contrast, was found to be an "organizer,

leader, manager or supervisor" and accorded a two-level

increase in his offense level. U.S.S.G. 3B1.1(c). This

enhancement is appropriate if the defendant "exercised some

degree of control over others involved in the commission of

the crime . . . ." United States v. Fuller, 897 F.2d 1217,

1220 (1st Cir. 1990). Here, the facts already recited amply

support the district court's finding that Torres' role was

-19-

equivalent to that of a job-site foreman: he took charge of

the negotiations with the undercover agents to fix the final

time for the drug transfer, orchestrated the arrival of the

vans, and directed the actions of De La Cruz and Rodriguez.

Contrary to Torres' argument in this court, the fact

that Torres may have been working for Lucho does not prevent

Torres from being treated as a supervisor. "A defendant need

not be the highest ranking member of a criminal troupe in

order to be a manager or supervisor." United States v.

Savoie, 985 F.2d 612, 616 (1st Cir. 1993). United States v.

Sostra, 967 F.2d 728 (1st Cir. 1992), relied upon by Torres,

is not on point. There, the defendant's role in the drug

transactions was that of "steerer," bringing together

potential buyers and sellers. Id. at 733. There was

"nothing in the record to show that he [Sostra] exerted

control over any of the other codefendants, with the possible

exception of his brother . . . ." Id.

In sum, we conclude that De La Cruz' conviction and

sentence and Torres' sentence were proper and must be

affirmed.

-20-