**UNITED STATES of America, Appellee,**

v.

**William W. LILLY, Defendant, Appellant.**

**No. 93–1577.**

United States Court of Appeals, First Circuit.

Heard Dec. 9, 1993.

Decided Jan. 4, 1994.

---

Mark M. Freeman and Rappaport, Freeman & Pinta, Boston, MA, on brief, for appellant.

A. John Pappalardo, U.S. Atty., and Brien T. O'Connor, Asst. U.S. Atty., Boston, MA, on brief, for United States.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

In this criminal appeal, defendant-appellant William W. Lilly claims that the district court engaged in impermissible "double counting" when calculating the guideline sentencing range (GSR) applicable to his case. Concluding that Lilly's assignment of error lacks force, we affirm the judgment below.

## I

The facts relevant to this appeal are not now disputed. Lilly, a successful developer, fell on hard times after the collapse of a boom market in real estate. He began to play fast and loose, courting trouble on several fronts. *See, e.g., United States v. Lilly,* 983 F.2d 300 (1st Cir.1992) (describing appellant's prosecution for bank fraud). On May 21, 1991, Lilly's woes mounted: a federal grand jury returned an indictment against him and two cohorts, Sheldon Stone and Gerald Sarro. The indictment focused on a condominium conversion project in Claremont, New Hampshire. It charged all three men with conspiracy, 18 U.S.C. § 371 (1988), and also charged Lilly with fifty-four substantive counts of making false statements to a federally insured financial institution, in violation of 18 U.S.C. § 1014 (1988).

On December 4, 1991, the grand jury returned another indictment accusing Lilly and five codefendants, Robert O'Connor, Gina Lonardo, Mark Lonardo, Barry Tevrow,

and Diane Tevrow, of having perpetrated eight counts of wire fraud, in violation of 18 U.S.C. § 1343 (1988). These charges involved a so-called "land flip" scheme,[1] separate from the Claremont boondoggle. After considerable skirmishing, not material here, the two indictments were consolidated and Lilly pled guilty to all counts on February 25, 1993.

## II

In respect to many crimes, particularly "white collar" crimes, the sentencing guidelines use the amount of the actual or intended loss as an important indicium in fixing a defendant's offense level and, hence, his GSR. *See, e.g., United States v. Tardiff,* 969 F.2d 1283, 1285 (1st Cir.1992) ("In respect to fraud crimes, the applicable offense level increases in proportion to the monetary magnitude of the loss."); *see also* U.S.S.G. § 2F1.1(b)(1).[2] Here, the district court, faced with several proposed scenarios, determined that the aggregate amount of the monetary loss stemming from appellant's involvement in the two schemes equalled $1,750,000—a total reached by evaluating the land-flip losses at $1,000,000 and the Claremont losses at $750,000.[3] This computation increased appellant's base offense level from six to eighteen. *See* U.S.S.G. § 2F1.1(b)(1)(M) (providing a twelve-level upward adjustment for fraud crimes involving more than $1,500,000, up to and including $2,500,000).

After holding appellant responsible for the overall amount of the combined losses, the court increased his offense level by two levels because his offenses involved more than minimal planning, *see* U.S.S.G. § 2F1.1(b)(2)(A), and by four additional levels because he played a leading role in the Claremont scheme, *see* U.S.S.G. § 3B1.1(a) (providing for a four-level increase if a defendant acts as an "organizer" or "leader" in an extensive criminal enterprise). The loss valuation, the planning adjustment, and the role-in-the-offense adjustment all adversely affected appellant's GSR and, hence, his 60-month sentence (a sentence within, but near the low end of, the GSR).

## III

On appeal, Lilly makes only a single argument. He says that the district court impermissibly "double counted" because it used his position as the kingpin in the Claremont scheme to increase his offense level in two different ways, first, as the basis for attributing the full amount of the loss to him, and, second, as the basis for an upward role-in-the-offense adjustment.[4] We reject appellant's construct for two independently sufficient reasons.

### A

■ At the outset, we note that appellant's claim suffers from a fatal strain of procedural default. While appellant voiced a double counting concern below—he contended that the planning adjustment, U.S.S.G. § 2F1.1(b)(2)(A), overlapped with, and represented double counting of, his leadership role, *id.* at § 3B1.1(a)—he did not raise the

---

1. We have described a land flip as "an intricate and sophisticated scheme ... under which real property is purchased for a low price, immediately resold at a much higher price to a straw or fictitious buyer, and the higher resale price is used as the basis for obtaining a mortgage loan that finances the entire transaction." *United States v. Cassiere,* 4 F.3d 1006, 1010 (1st Cir. 1993).

2. A sentencing court customarily applies the guidelines in effect on the date of sentencing. *See United States v. Bell,* 953 F.2d 6, 7 (1st Cir.1992); *United States v. Harotunian,* 920 F.2d 1040, 1041–42 (1st Cir.1990). Accordingly, this case is controlled by the November 1992 edition of the guidelines.

3. Appellant disputed both figures in the district court, but, on appeal, he does not challenge the district court's findings as to the amounts involved. Consequently, we deem all such arguments, together with any other arguments asserted below but not resurrected in this court, to be waived. *See United States v. Slade,* 980 F.2d 27, 30 n. 3 (1st Cir.1992); *United States v. St. Cyr,* 977 F.2d 698, 701 (1st Cir.1992).

4. In support of this argument, appellant points out that the district court, when sentencing the two other "Claremont defendants," assigned lesser amounts of loss to them, with the result that the loss attributed to appellant exceeded the aggregate loss attributed to others.

contention he advances here. For all intents and purposes, that ends the matter.[5] Legal arguments cannot be interchanged at will. *See United States v. Dietz*, 950 F.2d 50, 55 (1st Cir.1991) ("A criminal defendant, dissatisfied with the district court's rulings at sentencing yet persuaded that his original arguments lacked merit, cannot switch horses midstream in hopes of locating a swifter steed."). Mindful of this principle, "[w]e have repeatedly ruled, in connection with sentencing as in other contexts, that arguments not seasonably addressed to the trial court may not be raised for the first time in an appellate venue." *Id.; accord United States v. Ortiz*, 966 F.2d 707, 717 (1st Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993); *United States v. Uricoechea–Casallas*, 946 F.2d 162, 166 (1st Cir.1991); *United States v. Pilgrim Market Corp.*, 944 F.2d 14, 21 (1st Cir.1991); *United States v. Fox*, 889 F.2d 357, 359 (1st Cir.1989).

In order to preserve sentence-related points for appeal, litigants must raise them squarely in the lower court. Appellant cannot pass this test; indeed, he concedes that he never explained his current version of a double counting objection to the district court. The mere fact that appellant made a different double counting argument below, addressed to a different offense level adjustment, does not exempt him from the operation of the raise-or-waive rule. Thus, the appeal is by the boards.[6]

## B

The second fly in appellant's ointment is that no double counting occurred in this case. We explain briefly.

The amount of loss attributable to a particular participant in a jointly undertaken criminal activity is the sum of the amount of loss he personally caused (or intended to cause), and, under the relevant conduct rubric, U.S.S.G. § 1B1.3, the loss (actual or intended) stemming from acts by others that were reasonably foreseeable by him and were committed in furtherance of the conspiracy.[7] *See* U.S.S.G. § 1B1.3(a)(1)(B); *id.,* comment. (n. 2); *see also United States v. Moore*, 923 F.2d 910, 917 (1st Cir.1991). It follows that the measure of a defendant's accountability for transactions in which he was not personally involved "is usually congruent with the scope of his agreement with the other participants in the criminal enterprise." *United States v. Garcia*, 954 F.2d 12, 16 (1st Cir.1992). In other words, the scope of a participant's agreement—rather than his place in the conspiracy's hierarchy—determines the amount of loss properly laid at his doorstep for sentencing purposes.

To be sure, there is an overlap between "scope" and "role." It stands to reason that the majordomo of a scheme, having set the stage, probably will be saddled with more "relevant conduct" than a bit player. That overlap, however, does not mean that adjusting for a leadership role necessarily portends double counting in a case where the amount of loss influences the offense level. The two enhancements do not march in lockstep [8]

---

5. Lilly's original complaint has not been renewed on appeal. It is, in any event, jejune. *See United States v. Balogun*, 989 F.2d 20, 23–24 (1st Cir. 1993) (rejecting complaint that supervisory role adjustment constituted double counting in view of upward adjustment for more than minimal planning).

6. Of course, even though a defendant fails to raise a particular argument at the disposition hearing in the lower court, his sentence can still be reversed on the basis of that argument if the error is "plain." The criteria for a finding of plain error in the sentencing context are, however, rigorous. *See United States v. Olano*, —— U.S. ——, ———— ——, 113 S.Ct. 1770, 1777–79, 123 L.Ed.2d 508 (1993); *United States v. Olivier–Diaz*, 13 F.3d 1, 5 (1st Cir.1993); *see also United States v. La Guardia*, 902 F.2d 1010, 1012–13 (1st

Cir.1990). For the reasons stated *infra*, appellant cannot satisfy these exacting standards.

7. Generally speaking, a sentencing court looks to *intended* loss as well as *actual* loss. *See* U.S.S.G. § 1B1.3(a)(3) (stating that relevant conduct includes, *inter alia*, "all harm that was the object of [the] acts and omissions" comprising relevant conduct); *See also* U.S.S.G. § 2F1.1, comment. (n. 9) (cross-referencing U.S.S.G. § 2X1.1); U.S.S.G. § 2X1.1, comment. (n. 4). Here, the court chose to focus on actual loss, and neither party assigns error to that choice.

8. Take, for example, two participants in a criminal enterprise, one the mastermind and one a bottom-rung underling. The former is an organizer and leader; the latter is not. Yet, both may be chargeable with the entire amount of loss in a

and, moreover, serve different purposes in the sentencing calculus.

This case illustrates the point. Section 2F1.1(b)(1) is aimed at measuring the gravity of the offense. It does so by formulating a sliding scale that increases a defendant's probable punishment in rough proportion to the victims' financial loss (actual or intended). Thus, amount of loss becomes a proxy for the seriousness of an offense. *See, e.g.,* U.S.S.G. § 2F1.1(b), comment. (n. 10) (suggesting consideration of a departure if the amount of loss overstates or understates a crime's seriousness).

Conversely, the role-in-the-offense adjustment is not concerned with specific offense characteristics like amount of loss; it is aimed instead at measuring the culpability of a defendant's conduct in the commission of the offense and increasing (or reducing) the punishment in rough proportion to the defendant's involvement. The adjustment proposes, in effect, to treat less harshly those persons within a criminal organization who are on the fringes, *i.e.,* "minor" or "minimal" participants, *see* U.S.S.G. § 3B1.2, and to treat more harshly those who, although guilty of participating only in the self-same offense, bear greater "relative responsibility" and who, therefore, "present a greater danger to the public" and "are more likely to recidivate." U.S.S.G. § 3B1.1, comment. (backg'd.). Thus, role becomes a proxy for the degree of an offender's culpability.

We think this regime lies well within the Sentencing Commission's power. Sentencing factors do not come in hermetically sealed packages, neatly wrapped and segregated one from another. Rather, several factors may draw upon the same nucleus of operative facts while nonetheless responding to discrete concerns. Consequently, a degree of relatedness, without more, does not comprise double counting. So it is here: although calculating the amount of loss for which appellant is responsible requires some examination into what role he played in the

overall scheme, the upward adjustment for leadership does not, by dint of the loss-evaluation inquiry alone, equate to double counting. *Compare, e.g., United States v. Balogun,* 989 F.2d 20, 23–24 (1st Cir.1993) (differentiating between conduct undergirding supervisory role adjustment and conduct undergirding sentence enhancement for more than minimal planning). The proof of this pudding is that, if Lilly had organized exactly the same scheme and provided leadership to exactly the same accomplices, but bilked investors or lenders out of appreciably more (or appreciably less) money, the amount of loss would change, thus altering his offense level—but the role-in-the-offense enhancement would remain constant.

**C**

We add an eschatocol of sorts. Even if the district court's actions usefully could be described in some sense as double counting—and we doubt the accuracy of such a characterization, *see supra* Part III(B)—appellant would face a further hurdle.

Double counting in the sentencing context "is a phenomenon that is less sinister than the name implies." *United States v. Zapata,* 1 F.3d 46, 47 (1st Cir.1993). Since double counting is often perfectly proper, *see id.,* the guidelines themselves are the most helpful aid in the task of separating permissible double counting from its impermissible counterpart. The Sentencing Commission has not been bashful about explicitly banning double counting in a number of instances. *See, e.g.,* U.S.S.G. § 3A1.1, comment. (n. 2) (discussing "vulnerable victim" enhancement); U.S.S.G. § 3A1.3, comment. (n. 2) (discussing enhancement relating to restraint of victim); U.S.S.G. § 3C1.2, comment. (n. 1) (discussing "reckless endangerment" enhancement). We believe the Commission's ready resort to explicitly stated prohibitions against double counting signals that courts should go quite slowly in implying further such prohibitions where none are written.[9] *Accord United States v. Wong,* 3 F.3d 667, 670–71 (3d Cir.

particular case, say, if the underling is a forger who, knowing the plan, follows the mastermind's lead and doctors the critical paperwork, thus consummating the fraud.

9. Some circuits have held that double counting is always permissible except when it is expressly forbidden by the guidelines. *See, e.g., United States v. Reese,* 2 F.3d 870, 894–95 (9th Cir. 1993), *petition for cert. filed* (Oct. 28, 1993) (No.

**20**

1993); *United States v. Sanders,* 982 F.2d 4, 8 (1st Cir.1992) (per curiam), *cert. denied,* — U.S. —, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993); *United States v. Rocha,* 916 F.2d 219, 243 (5th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991); *United States v. Goolsby,* 908 F.2d 861, 863 (11th Cir.1990).

In the situation at hand, the guidelines not only fail expressly to outlaw double counting, but also imply the exact opposite. They specifically instruct that persons who commit fraud offenses ought to receive sentences commensurate with the amount of loss for which they are responsible, and that those who marshal criminal enterprises ought to receive extra punishment for their leadership roles. We think that when, as now, neither an explicit prohibition against double counting nor a compelling basis for implying such a prohibition exists, clearly indicated adjustments for seriousness of the offense and for offender conduct can both be imposed, notwithstanding that the adjustments derive in some measure from a common nucleus of operative facts. *See, e.g., Balogun,* 989 F.2d at 23–24; *United States v. Newman,* 982 F.2d 665, 673 (1st Cir.1992), *cert. denied,* — U.S. —, 114 S.Ct. 59, 126 L.Ed.2d 28 (1993); *Sanders,* 982 F.2d at 8; *see also Zapata,* 1 F.3d at 50 (holding that where the guidelines provide for the consideration of a single factor in the calculation of both offense level and criminal history category, either expressly or by fair implication, double counting is permissible).

### IV

We need go no further. Concluding, as we do, that appellant's assignment of error is without merit, we affirm the judgment below.

*Affirmed.*

93–6552); *United States v. Ellen,* 961 F.2d 462, 468 (4th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 217, 121 L.Ed.2d 155 (1992); *United States v. Williams,* 954 F.2d 204, 208 (4th Cir.1992). That view is, however, not without its detractors. *See, e.g., United States v. Hudson,* 972 F.2d 504, 507 (2d Cir.1992) (declining to follow *Williams* ); *United States v. Romano,* 970 F.2d 164, 167 (6th Cir.1992) (similar); *cf. United States v. Fuller,* 897 F.2d 1217, 1222 (1st Cir.1990) (voicing concern about whether a single factor can be double counted in setting a defendant's offense level). We leave this question open, as the case at hand can be resolved by the application of less controversial principles.